45987. ALLEN v. THE STATE.
(377 SE2d 150)

CLARKE, Justice.

William Horton Allen was convicted by a jury of malice murder and armed robbery. He was sentenced to death for the murder.[1]

In November of 1984, 15-year-old Holly Coomber, having spent time in a children's home, a juvenile detention center, and several fos-

---

[1] The crime was committed October 19, 1986. The defendant was arrested on November 8, 1986. The trial began on October 19, 1987, and ended on October 24, 1987. A motion for new trial was filed November 13, 1987. The motion was heard June 7, 1988, and denied the same date. The case was docketed in this court on July 12, 1988, and the case was argued orally on September 27, 1988.

ter homes, was placed by the relevant New York state agency with the defendant and his family. Allen, then 45, had been married for 17 years. Holly Coomber testified that she and the defendant soon became lovers. Allen left his wife and he and Coomber began living together. They moved to Missouri for a while, returned to New York for a while, and then decided to go to Florida.

Early in the morning of October 19, 1986, they stopped at a convenience store in Glynn County, Georgia, not far from Interstate 95. The two robbed the store of $52. The lone employee on duty was killed and her body was discovered later that morning in the store's cooler. Allen and Coomber drove on to Florida, but returned to New York by October 21, where they stayed with Allen's sister-in-law.

On November 6, 1986, the two again left for Florida. Two hours after they left, a convenience store in nearby Seneca Falls, New York was robbed, and the store's lone employee was taken to a back room of the store and killed.

The employees of both stores were killed by two gunshot wounds. All four bullets were later analyzed and determined to have been fired from a handgun owned by the defendant.

Allen and Coomber were arrested in Sylvania, Georgia, on November 8, 1986. Allen gave a brief statement to police that day, stating that the police had his gun, and that was all they needed. When told the bullets from the New York victim matched, he stated, "Well, I guess you've got me on that, too." When asked why he killed "the two women in the stores," he responded, "No witnesses." Allen claimed that Holly Coomber had nothing to do with either crime.

The next day, Allen was interrogated, and gave a lengthy statement describing both crimes. Again, he stated that Coomber was not involved, claiming that she was asleep in the car while he committed the crimes.

Coomber was interrogated, and she, too, stated that she had been asleep in the car and knew nothing about the crimes. However, she told other inmates that she had killed both victims.

A few weeks later, Allen called one of the investigators and told him that he had been lying to protect Holly Coomber and that, in fact, she was the killer. Coomber also changed her story. She wrote a letter to the Georgia victim's husband stating that Allen

knew nothing of the actual killing until he saw me extract the two used shells from the gun. Bill [Allen] only tried to protect me from harm.

She also wrote to the Brunswick News and gave a written statement to investigators that she and not Allen had killed the two victims and that Allen was innocent.

Later, Coomber changed her mind again, now admitting that she had been involved in the robberies (and was not asleep in the car as she originally had claimed) but that Allen had killed both victims.

Coomber testified at trial consistently with her final pre-trial version of the events, claiming that she had admitted responsibility only because she had been conned by Allen into believing that, because of her age and sex, she would get off light and they could be together again after she served her time.

1. Officer Jack Boyet conducted the interrogation of Allen on November 9, 1986. Allen asked Boyet some questions about the Georgia judicial system, including whether or not an attorney would be appointed to represent him. Boyet told him the court would appoint an attorney to represent him. Allen asked "when he would get to see one," and Boyet replied, "it would be up to the attorney as to when he came to see him."

After "about ten minutes of conversation" Officer Boyet asked Allen "did he want to talk to him again today." Allen's answer was: "I'll talk to you after I've talked to my lawyer." Then, according to the transcript, the following occurred:

Q. All right, sir. And what was your response to that?

A. I asked him if he was serious about that.

Q. And what did he say?

A. He asked me, he said, what is it you want to know, Jack.

Q. And then what did you tell him, if anything?

A. I told him I—all I wanted to know was the truth about what happened in the store here and the store in New York.

Q. And what was his response?

A. His response was, hell, I'll tell you that now.

Q. All right, sir. After he did that, did you advise him of anything?

A. Yes, sir.

Q. And what did you advise him of?

A. The Miranda warning rights. . . . I then asked him if he understood those rights and if he still wanted to talk to

me.

Q. And what was his response?

A. That he did.

(a) If an accused in custody asserts his right to the assistance of counsel, that is, if he

expresse[s] his desire to deal with the police only through counsel, [then he] is not subject to further interrogation by the authorities unless counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police.

*Edwards v. Arizona*, 451 U. S. 477, 484-85 (101 SC 1880, 68 LE2d 378) (1981).

Allen contends here, as he did below, that his statement to Boyet—"I'll talk to you after I've talked to my lawyer"—was a clear and unequivocal assertion of his right to counsel, and that all interrogation should immediately have ceased.

The state's response at trial was:

MR. CROWE: Your Honor, we would, of course, take issue with Mr. Manning's position. First of all, he—taking this one particular statement and saying that that particular statement is unequivocal. There was a conversation between Mr. Boyet and between Mr. Allen in which Mr. Allen said, well, I'll talk to you after I get a lawyer.

Instantly, Mr. Boyet said, are you serious? He said, well, what is it we want to know. And right there, that's when the equivocation came in, when you take that conversation together as a whole. You can't just dissect it and pick out the pieces of that conversation you want to use.

The state's contention that the defendant's subsequent responses were relevant to the issue of the clarity of the initial request was incorrect. In *Smith v. Illinois*, 469 U. S. 91 (105 SC 490, 83 LE2d 488) (1984), the U. S. Supreme Court considered a request for counsel that the lower courts had found ambiguous "*only* by looking to Smith's *subsequent* responses to continued police questioning," id. at 494, (emphasis in original) and held:

[U]nder the clear logical force of settled precedent, an accused's *post request* responses to further interrogation may

not be used to cast retrospective doubt on the clarity of the initial request itself.

Id. at 495.

Allen's initial invocation of his right to counsel could not have been clearer or less equivocal; he would talk to Boyet only *after* he talked to his lawyer. Under *Smith v. Illinois*, supra, any "equivocation" that "came in" later cannot be used to cast doubt on the clarity of that initial request. Compare *Hall v. State*, 255 Ga. 267 (1) (336 SE2d 812) (1985).

(b) The state further argues that Officer Boyet's response to Allen's request was not a continued interrogation. However, this position also is answered by *Smith v. Illinois*. According to *Smith*, *"Edwards* set forth a 'bright-line rule' that *all* questioning must cease after an accused requests counsel." *Smith v. Illinois*, supra at 494. (Emphasis in original.) In *Smith* the defendant had asserted his right to counsel while being advised of his *Miranda* rights. After the defendant asserted his right, the officer merely read the final *Miranda* right and then asked the defendant, "Do you wish to talk to me at this time without a lawyer being present?" This action was found to be "continued police questioning." *Smith v. Illinois*, supra at 494 (fn. 6 and fn. 7).

The trial court erred by examining the "totality of the circumstances" (transcript, hearing of July 9, 1987 at 105) to decide whether Allen's request for counsel was clear or equivocal. *Owen v. Alabama*, 849 F2d 536, 539 (11th Cir. 1988). Allen's November 9 statement was taken in violation of his Fifth Amendment right to counsel, and, under U. S. Supreme Court precedent, should have been excluded from the state's case in chief.

(c) Even without the November 9 statement, the evidence in this case is sufficient under *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979), to support the verdict. Compare *Lockhart v. Nelson*, 488 U. S. ___ (109 SC 285, 102 LE2d 265) (1988). It cannot be said, however, that the constitutional error was harmless beyond a reasonable doubt. See *Vaughn v. State*, 248 Ga. 127 (2) (281 SE2d 594) (1981).

2. The remaining enumerations of error need not be addressed. *Judgment reversed. All the Justices concur.*

DECIDED MARCH 13, 1989.

*Alice C. Stewart*, for appellant.

*Glenn Thomas, Jr., District Attorney, Michael J. Bowers, Attorney General, Susan V. Boleyn, Senior Assistant Attorney General,*

for appellee.